UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**CENTER FOR INTERNATIONAL**        )
**ENVIRONMENTAL LAW,**              )
                                    )
      **Plaintiff,**         )
                                    )
      **v.**                 )    Civil Action No. 01-498 (RWR)
                                    )
**OFFICE OF THE UNITED STATES**     )
**TRADE REPRESENTATIVE** et al.,    )
                                    )
      **Defendants.**        )
_____ )

### MEMORANDUM OPINION AND ORDER

The Center for International Environmental Law ("CIEL") brought this action against the United States Trade Representative[1] and his office (collectively "USTR"), seeking documents under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. USTR has renewed its motion for summary judgment regarding one document.[2] Because USTR has not sufficiently demonstrated that disclosure of the document would harm the United States' national security interests, USTR's renewed motion for summary judgment will be denied.

---

[1] Ron Kirk has been substituted as a defendant under Federal Rule of Civil Procedure 25(d).

[2] USTR filed a notice stating that three previously withheld documents had been released to the CIEL and that document 1 was the only remaining document at issue. (See Notice of Release of Documents, Nov. 21, 2008.)

BACKGROUND

The background of this case is fully discussed in <u>Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative</u>, 505 F. Supp. 2d 150, 153-54 (D.D.C. 2007). Briefly, CIEL filed a FOIA request with USTR seeking documents concerning sessions of the Negotiating Group on Investment for the Free Trade Agreement of the Americas ("FTAA"). During one of these negotiations, USTR provided to negotiators documents containing the United States' position on trade investment issues. The nations participating in the FTAA had an understanding that any negotiating document produced or received in confidence during the negotiations would not be released to the public unless all nations agreed. (Defs.' Suppl. Br. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Suppl. Br."), Lezny Decl. ¶ 5.)

The United States submitted the document in dispute here during FTAA negotiations, and the FTAA Administrative Secretariat deemed it restricted. No restricted FTAA document appears to have been released by any of the participating nations. (<u>Id.</u> ¶ 6.) After the countries negotiating the FTAA derestricted three of the four documents at issue, the defendant released those documents to the plaintiff. (Notice of Release of Documents, Nov. 21, 2008.) Document 1, which USTR argues is a classified national security document protected from disclosure under 5 U.S.C. § 552(b)(1), is the only document that remains in

dispute. The document explains the United States' initial proposed position on the meaning of the phrase "in like circumstances." (Defs.' Suppl. Br., Vaughn Index ¶ 1.) This phrase "appears in rules requiring each party to provide investors from the other party that have made or seek to make investments in the party's territory 'national treatment' and 'most-favored-nation' treatment (MFN)." (Defs.' Suppl. Br., Bliss Decl. ¶ 13.)

In its supplemental brief renewing its motion for summary judgment, USTR argues that disclosure of document 1 would breach a non-disclosure agreement and damage foreign relations by causing nations to adopt more rigid trade positions, resulting in less favorable trade terms for the United States. (Defs.' Suppl. Br. at 6-7.) USTR further argues that disclosure of document 1 would harm the United States' position in future trade litigation and subject the United States to trade or investment retaliation. (Id. at 8-9.) CIEL opposes, arguing that USTR did not "establish that disclosure of the documents reasonably could be expected to result in damage to U.S. foreign relations or national security." (Pl.'s Resp. to Defs.' Suppl. Br. in Supp. of Their Mot. for Summ. J. ("Pl.'s Resp.") at 2.)

## DISCUSSION

Summary judgment may be granted when the materials in the record show "that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009). A court must draw all reasonable inferences from the evidentiary record in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In a FOIA suit, an agency is entitled to summary judgment if it demonstrates that no material facts are in dispute and that all information that falls within the class requested either has been produced, is unidentifiable, or is exempt from disclosure. Students Against Genocide v. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001); Weisburg v. Dep't of Justice, 627 F.2d 365, 368 (D.C. Cir. 1980). A district court must conduct *de novo* review of the record in a FOIA case, and the agency resisting disclosure bears the burden of persuasion in defending its action. 5 U.S.C. § 552(a)(4)(B); see also Akin, Gump, Strauss, Hauer & Feld, LLP v. U.S. Dep't of Justice, 503 F. Supp. 2d 373, 378 (D.D.C. 2007).

The FOIA requires agencies to comply with requests to make their records available to the public, unless information is exempted by clear statutory language. 5 U.S.C. §§ 552(a), (b); Oglesby v. U.S. Dep't of Army, 79 F.3d 1172, 1176 (D.C. Cir. 1996). Although there is a "strong presumption in favor of disclosure," U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991), there are nine exemptions to disclosure set forth in 5 U.S.C. § 552(b). These exemptions are to be construed as

narrowly as possible to maximize access to agency information, which is one of the overall purposes of the FOIA. Vaughn v. Rosen, 484 F.2d 820, 823 (D.C. Cir. 1973).

Because the party requesting disclosure cannot know the precise contents of the documents withheld, it is at a disadvantage to claim misapplication of an exemption, and a factual dispute may arise regarding whether the documents actually fit within the cited exemptions. Id. at 823-24. To provide an effective opportunity for the requesting party to challenge the applicability of an exemption and for the court to assess the exemption's validity, the agency must explain the specific reason for nondisclosure. Id. at 826; see also Oglesby, 79 F.3d at 1176 ("The description and explanation the agency offers should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection."). Conclusory statements and generalized claims of exemption are insufficient to justify withholding. Vaughn, 484 F.2d at 826; see also Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977) (noting that "the burden which the FOIA specifically places on the Government to show that the information withheld is exempt from disclosure cannot be satisfied by the sweeping and conclusory citation of an exemption" (footnote omitted)). Where disclosures are not sufficiently detailed to permit a meaningful *de novo*

review, a court may order the agency to submit more detailed disclosures. Voinche v. FBI, 412 F. Supp. 2d 60, 65 (D.D.C. 2006), remanded on other grounds, No. 06-5130, 2007 WL 1234984 (D.C. Cir. Feb. 27, 2007).

USTR asserts that document 1 is subject to Exemption 1, which protects from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]" 5 U.S.C. § 552(b)(1). The D.C. Circuit has set forth specific requirements to justify withholding documents under Exemption 1:

> the agency affidavits must, for each redacted document or portion thereof, (1) identify the document, by type and location in the body of documents requested; (2) note that Exemption 1 is claimed; (3) describe the document withheld or any redacted portion thereof, disclosing as much information as possible without thwarting the exemption's purpose; (4) explain how this material falls within one or more of the categories of classified information authorized by the governing executive order; and (5) explain how disclosure of the material in question would cause the requisite degree of harm to the national security.

King v. U.S. Dep't of Justice, 830 F.2d 210, 224 (D.C. Cir. 1987).

"[I]n conducting *de novo* review in the context of national security concerns, courts must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." Wolf v. CIA, 473 F.3d 370, 374

(D.C. Cir. 2007) (internal quotation marks omitted). "[A] reviewing court 'must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm.'" Id. (alteration in original) (quoting Halperin v. CIA, 629 F.2d 144, 149 (D.C. Cir. 1980)); see also Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003) (noting that, in the FOIA context, courts "have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review").

However, summary judgment may be withheld and the agency required to provide a new declaration when the agency's affidavit is inadequate. See Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 31 (D.C. Cir. 1998) (remanded because declaration provided only a sweeping conclusory assertion of anticipated harm to national security and instructed the district court to require a new declaration); King, 830 F.2d at 223-25 (remanded because agency materials inadequately described the redacted material and did not explain with sufficient specificity how disclosure would harm national security). "[A]n affidavit that contains merely a 'categorical description of redacted materials coupled with categorical indication of anticipated consequences of disclosure

is clearly inadequate.'" PHE, Inc. v. Dep't of Justice, 983 F.2d 248, 250 (D.C. Cir. 1993) (quoting King, 830 F.2d at 224). An agency affidavit must provide "detailed and specific information" demonstrating a logical nexus between the material and exemption claimed to justify summary judgment. Campbell, 164 F.3d at 30. Assertions in agency affidavits that are contradicted by other evidence in the record do not meet this standard. See Halperin, 629 F.2d at 148.

USTR is withholding document 1 based on the classification criteria of Executive Order 12958 (Def.'s Suppl. Br. at 5), which permits classification of information if, among other requirements that are uncontested here, "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security . . . and . . . is able to identify or describe the damage." 60 Fed. Reg. 19826 § 1.2(a)(4) (revoked by Executive Order 13526, 75 Fed. Reg. 707, which uses identical classification criteria in this context). "'Damage to the national security' means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, to include the sensitivity, value, and utility of that information." Id. § 1.1(l). USTR asserts that the document is properly classified as relevant to "'foreign relations or foreign activities of the

United States, including confidential sources.'"[3] (Defs.' Suppl. Br. at 6 (quoting Executive Order 12958 § 1.4(d)).)

USTR argues that release of document 1 would constitute a breach of its agreement with the other nations participating in the FTAA negotiations. (Defs.' Suppl. Br. at 7.) Karen Lezny, the Deputy Assistant United States Trade Representative for the FTAA, states that

> [t]here is an understanding among the 34 participating governments, consistent with longstanding practice in multiparty trade negotiations, that they will not release to the public any negotiating documents they produce or receive in confidence in the course of the negotiations unless there is a consensus among the 34 governments to do so.

(Id., Lezny Decl. ¶ 5.) The United States submitted document 1 to the Secretariat during FTAA negotiations and, as agreed by the nations, the Secretariat marked the negotiation documents as restricted. (Id. ¶ 6.) In USTR's experience, foreign governments may be under pressure to safeguard local economic interests, which are affected by USTR's efforts to protect U.S. firms' investments from "arbitrary or unfair government conduct"

---

[3] CIEL argues that the document "more properly fall[s] under Section 1.5(b) as 'foreign government information[.]'" (Pl.'s Resp. at 6-7 n.6.) While the "foreign government information" classification could apply, documents created by the USTR and submitted during FTAA negotiations can also fall within the classification category relating to "foreign relations or foreign activities" of the United States. Because the parties agree that the document falls into some classification category, the relevant inquiry is whether USTR has identified adequately the harm that would result from disclosure.

by foreign nations. (Id., Bliss Decl. ¶ 10.) USTR claims that if foreign nations expect that their trade positions will be publicly disclosed, their room to negotiate will be "substantially reduce[d]" given the local economic pressures. (Id.) CIEL contends that "there is no expectation that a government is required to keep its own negotiating positions confidential from its own citizens" and that the United States has made its negotiating positions known to its citizens through public briefings and consultations in the past. (Pl.'s Resp., Magraw Decl. ¶¶ 4-7.)

The prospect of revealing foreign government information typically supports withholding disclosure under Exemption 1. See Students Against Genocide v. Dep't of State, Civil Action No. 96-667 (CKK/JMF), 1998 WL 699074, at *11 (D.D.C. Aug. 24, 1998) (finding that defendant's affidavit, which asserted that disclosure of foreign government information would make foreign governments less willing to provide information in the future, supported application of Exemption 1); Krikorian v. Dep't of State, Civil Action No. 88-3419 (RCL), 1990 WL 236108, at *2 (D.D.C. Dec. 19, 1990) (finding application of Exemption 1 supported by the defendant's affidavit, which asserted that disclosure of foreign government information would breach the "accepted diplomatic practice that when a foreign government conveys information to, or consults confidentially with, a U.S.

Government official, it does so on the understanding that the nature or substance of such exchanges will not be divulged" and "would also discourage foreign officials from providing our government with sensitive confidential information in the future" (internal quotation marks and footnote omitted)), remanded on other grounds, 984 F.2d 461 (D.C. Cir. 1993); Azmy v. U.S. Dep't of Def., 562 F. Supp. 2d 590, 600 (S.D.N.Y. 2008) (finding exemption appropriate because disclosure of information provided to the Joint Task Force-Guantanamo "would impair [the department's] ability to obtain information from foreign governments in the future, who will be less likely to cooperate with the United States if they cannot be confident that the information they provide will remain confidential").  However, while disclosure here would breach the understanding with the other participating governments, the claim that such a breach would harm national security is much less compelling than it was in Students Against Genocide, Krikorian, or Azmy, since the United States would be revealing its own position only, not that of any other country.  USTR, therefore, has not shown it likely that disclosing document 1 would discourage foreign officials from providing information to the United States in the future because those officials would have no basis for concluding that the United States would dishonor its commitments to keep foreign information confidential.

However, USTR also asserts that disclosure -- even of a document that the United States itself produced -- could "undermine the ability of the United States to negotiate and conclude the FTAA and other trade and investment agreements on terms favorable to the U.S. economic and security interests" by damaging the trust that negotiating partners have in the United States. (Def.'s Suppl. Br., Bliss Decl. ¶ 8.) USTR concludes that in the absence of mutual trust, the U.S.' trade partners "are more likely to adopt and maintain rigid negotiating positions[,]" reducing the likelihood of eventual agreement. (Id. ¶ 10.) USTR's explanation here is more detailed than the explanation that it unsuccessfully made in the earlier round of summary judgment motions.[4] However, the explanation is also inconsistent with USTR's professed rationale for not disclosing the meaning of "in like circumstances."

USTR argues that disclosure of document 1 would reveal the United States' interpretation of the phrase "in like

---

[4] In addition to noting the pressure on foreign governments and the possible resistance to the U.S.' proposals, USTR also explains more specifically that the negotiations would stall because negotiating partners would "adopt similar tactics," that release of information would be perceived by a foreign country as "an unfair effort [by the U.S.] to entrench its positions[,]" and that foreign governments are under pressure "to protect vested local economic interests from U.S. firms that seek investment protections under U.S.-negotiated trade and investment agreements from arbitrary or unfair [foreign] government conduct." (Defs.' Suppl. Br., Bliss Decl. ¶¶ 10-11.) Cf. Ctr. for Int'l Envtl. Law, 505 F. Supp. 2d at 157.

circumstances," which would harm the economic and security interests of the United States. (Defs.' Suppl. Br. at 8-9.) The meaning of "in like circumstances" defines the conditions under which the national treatment and most-favored-nation treatment rules apply. (<u>Id.</u>, Bliss Decl. ¶ 13.) Document 1 contains the USTR's position on the phrase's interpretation, and USTR argues that foreign nations could use USTR's position as evidence that the United States has breached investment agreements, which could "potentially subject the United States to trade or investment retaliation, causing harm to U.S. foreign relations." (<u>Id.</u> ¶ 15.) "Under those agreements foreign investors, including foreign governments that are investors, are entitled to pursue arbitration against the United States to enforce the investment protections established under the agreements." (<u>Id.</u> at ¶ 14.) There is a "wide variety of factual circumstances that could characterize investment relationships," and "the United States might want to assert a broader or narrower view of the meaning and applicability of the 'in like circumstances' doctrine[.]" (<u>Id.</u>) USTR claims that the government would not be as effective in asserting a broad or narrow interpretation in future litigation with foreign investors if the United States' interpretation of "in like circumstances" were disclosed. (<u>Id.</u>)

This asserted need for flexibility in defining "in like circumstances" however, is inconsistent with USTR's stated goal

of maintaining the trust of its negotiating partners.  It hardly seems consonant to argue on the one hand that disclosure would harm national security because it would undermine trade partners' trust in the United States, and on the other hand that disclosure would harm national security because it would prevent the United States from articulating one interpretation of "in like circumstances" in trade negotiations and then adjusting that definition to suit its needs in other situations -- a tactic that would presumably undermine the trust of foreign governments in the United States.  Although a court must defer to agency affidavits predicting harm to the national security, "[d]eference . . . does not mean acquiescence."  Larson v. Dep't of State, Civil Action No. 02-1937 (PLF), 2005 WL 3276303, at *9 (D.D.C. Aug. 10, 2005).  To the extent that judicial review must at least ensure that statements in agency affidavits are not "called into question by contradictory evidence in the record[,]" Halperin, 629 F.2d at 148, inconsistent predictions of harm from disclosure should not provide the basis for withholding a document.  Such inconsistency is an indication of unreliability, and the agency affidavits will be shown no deference with respect to any justification for withholding that involves maintaining the trust of negotiating partners.  Cf. Elec. Privacy Info. Ctr. v. Dep't of Justice, 511 F. Supp. 2d 56, 66 (D.D.C. 2007) (noting that a court's "decision must take seriously the government's

predictions about the security implications of releasing particular information to the public, at least where those predictions are sufficiently detailed and do not bear any indicia of unreliability").

Finally, USTR contends that disclosure of its own trade positions would create the perception among foreign nations that the United States is attempting to strengthen its bargaining position through public pressure, which, in turn, might cause foreign nations to attempt to increase public support for their own positions and might reduce the likelihood of compromise among nations. (Id., Bliss Decl. ¶ 11.) This explanation does not provide a logical nexus between the document and the claimed national security exemption. USTR would not be releasing document 1 by way of a unilateral decision that a negotiating partner could perceive as a negotiating tactic. Rather, USTR would be releasing document 1 to comply with the FOIA –– after protracted litigation no less –– and it is implausible that negotiating partners would view disclosure under such circumstances as an "unfair effort to entrench [USTR's] positions by generating . . . domestic pressure to resist giving ground." (Id.)

## CONCLUSION AND ORDER

USTR has not sufficiently shown that releasing document 1 would result in a harm to national security, and that Exemption 1 applies. Accordingly, it is hereby

ORDERED that USTR's renewed motion [42] for summary judgment be, and hereby is, DENIED. It is further

ORDERED that the parties file by May 12, 2011 a joint status report and proposed order proposing a schedule on which the case should proceed.

SIGNED this 12th day of April, 2011.

                                            /s/
                                    RICHARD W. ROBERTS
                                    United States District Judge