UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
CENTER FOR INTERNATIONAL        )
ENVIRONMENTAL LAW,              )
                                )
        Plaintiff,              )
                                )
        v.                      )      Civil Action No. 01-498 (RWR)
                                )
OFFICE OF THE UNITED STATES     )
TRADE REPRESENTATIVE, et al.,   )
                                )
        Defendants.             )
_____)

MEMORANDUM OPINION

The Center for International Environmental Law ("CIEL")
brought this action against the United States Trade
Representative and his office (collectively "USTR"), seeking
documents under the Freedom of Information Act ("FOIA"), 5 U.S.C.
§ 552.  The only document remaining at issue is "Document 1," a
one-page position paper produced by the United States during
negotiations to conclude a free-trade agreement with foreign
nations.  USTR has filed a second renewed motion for summary
judgment, and CIEL has filed a cross-motion for summary judgment.
Having been afforded three opportunities to justify withholding
the document, USTR has not provided a plausible or logical
explanation for why disclosure of the document would harm the
United States' foreign relations.  Accordingly, USTR's motion for
summary judgment will be denied, CIEL's cross-motion will be
granted, and USTR will be ordered to disclose Document 1.

- 2 -

BACKGROUND

The background of this case is fully discussed in Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative ("CIEL I"), 505 F. Supp. 2d 150, 153-54 (D.D.C. 2007), and Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative ("CIEL II"), 777 F. Supp. 2d 77, 80-81 (D.D.C. 2011).  As to facts relevant here, CIEL seeks "Document 1," a position paper prepared by USTR during sessions of the Negotiating Group on Investment for the Free Trade Agreement of the Americas ("FTAA").  The purpose of the agreement was to create a free-trade area among thirty-four nations in the western hemisphere.  The United States took part in FTAA negotiations during the 1990s and 2000s, but no agreement was reached.  (Defs.' Stmt. of Material Facts Not in Dispute ("Defs.' Stmt.") ¶¶ 2-4.)  Document 1 sets forth the United States' initial proposed position on the meaning of the phrase "in like circumstances."  (Mem. of P. & A. in Supp. of Defs.' Second Renewed Mot. Summ. J. ("Defs.' Mem.") at 2.)  This phrase "helps clarify when a country must treat foreign investors as favorably as local or other foreign investors -- *i.e.*, when 'national' treatment or 'most-favored-nation' treatment applies." (Id.; Defs.' Suppl. Br. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Suppl. Br."), Bliss Decl. ("First Bliss Decl.") ¶¶ 13-14.)

- 3 -

The nations participating in the FTAA negotiations agreed
initially that any negotiating document produced or received in
confidence during the negotiations would not be released to the
public unless all nations agreed.  (Defs.' Mem. at 2; Defs.'
Suppl. Br., Lezny Decl. ¶ 5.)  Later they "agreed that all FTAA
documents would become derestricted and available for public
release on December 31, 2013, unless a country were to object to
the release of one of its own documents at that time."  (Defs.'
Mem. of P. & A. in Opp'n to Pl.'s Cross-Mot. Summ. J. and Reply
Mem. in Supp. of Defs.' Second Renewed Mot. Summ. J. ("Defs.'
Opp'n"), Bliss Decl. ("Third Bliss Decl.") ¶ 5.)  Subsequently,
the then-Deputy United States Trade Representative extended the
"Confidential" classification of all FTAA documents under USTR's
control until December 31, 2013, "in order to be consistent with
[the United States'] international obligation."  (Defs.' Mem. at
1; Third Bliss Decl. ¶ 6.)  USTR classified Document 1 based on
the criteria of Executive Order 12958 (Defs.' Mem. at 1), which
permits classification of information if, among other
requirements that are uncontested here, "the original
classification authority determines that the unauthorized
disclosure of the information reasonably could be expected to
result in damage to the national security . . . and . . . is able
to identify or describe the damage."  60 Fed. Reg. 19826

- 4 -

§ 1.2(a)(4) (revoked by Executive Order 13526, 75 Fed. Reg. 707,
which uses identical classification criteria in this context).[1]

USTR has twice previously moved for summary judgment,
arguing that disclosure of Document 1 would damage foreign
relations by violating the confidentiality agreement among the
FTAA nations and causing nations to adopt more rigid trade
positions, resulting in less favorable trade terms for the United
States.  Both motions were denied on grounds that USTR had not
sufficiently substantiated the asserted harms.  Specifically, the
most recent memorandum opinion noted that USTR had not shown it
likely that disclosure of Document 1 would damage trust with
other FTAA nations, because Document 1 is the United States' own
material and its disclosure would not necessarily provide a basis
for foreign officials to think that United States might dishonor
its commitments to keep foreign information confidential.  CIEL
II, 777 F. Supp. 2d at 84.  In addition, the opinion noted the
apparent inconsistency of USTR's argument on the one hand that
breaching the confidentiality agreement would damage foreign

---

[1] In its cross-motion for summary judgment, CIEL argued that
Document 1 ceased to be classified under the Executive Order in
2011, but it withdrew this argument (Pl.'s Reply in Support of
Pl.'s Cross-Mot. Summ. J. at 2 n.1) in light of the defendants'
representation and supporting declaration that a USTR official
with original classification authority extended the
classification of Document 1 until December 31, 2013 (Defs.'
Opp'n at 2; Third Bliss Decl. ¶¶ 5-7).  The dispute, therefore,
concerns whether the classification was proper under the criteria
set forth in the Executive Order.

officials' trust that the United States would honor its
commitments, and its argument on the other hand that disclosing
the document would harm national security by hindering the United
States' flexibility to assert different meanings of "in like
circumstances" in different contexts, a tactic that could
undermine foreign governments' trust in the United States.  Id.
at 85.  The opinion also found unconvincing USTR's argument that
disclosure of the document would create the perception among
foreign nations that the United States was attempting to entrench
its own interpretation of the phrase at issue, noting that USTR
would not be releasing the document by way of unilateral
volition, but by way of court-ordered compliance with FOIA.  Id.

   USTR has again moved for summary judgment, clarifying and
augmenting its previous arguments for withholding Document 1.
USTR maintains that the United States at present is negotiating
trade and investment agreements, some but not all of which
involve the FTAA countries.  (Defs.' Mem. at 11 (citing Second
Bliss Decl. ¶ 5).)  It argues that the loss of trust caused by
releasing Document 1 would impede these on-going and future
negotiations.  Id.  In addition, USTR elaborates why disclosure
would decrease the United States' flexibility in on-going and
future negotiations, positing that even if the United States
might want Document 1's interpretation of "in like circumstances"
to be accepted by foreign governments in other agreements, the

United States might want to "negotiate up" to that position or to preserve its negotiating capital by accepting another country's proposal of that interpretation rather than expending effort to convince other governments to accept the United States' disclosed FTAA position.  (Defs.' Mem. at 16 (citing Second Bliss Decl. ¶ 10).)  USTR also reasserts its position that disclosing Document 1 would increase the risk of adverse arbitration decisions, should arbitrators be willing to look to the document for assistance in interpreting the term.  (Defs.' Mem. at 13-14.) USTR contends that its desire to maintain the United States' flexibility to assert different interpretations of "in like circumstances" in different contexts is not inconsistent with its commitment to maintain foreign governments' trust by adhering to the confidentiality agreement.  "Because the FTAA was never concluded, FTAA governments do not view Document 1 as binding the United States[,]" USTR argues, and "[t]hus, asserting an interpretation different from the one set forth in Document 1 would not be seen as a breach of trust."  (Defs.' Mem. at 15.)

CIEL opposes USTR's motion and itself moves for summary judgment on the grounds that the defendants fail to substantiate their claims that foreign governments would lose trust in the United States in the event USTR is compelled to disclose its own negotiating document.  (Pl.'s Mem. of P. & A. in Opp'n to Defs.' Second Renewed Mot. Summ. J. and in Support of Pl.'s Cross-Mot.

Summ. J. ("Pl.'s Mem.") at 13-19.)  In addition, CIEL argues that
USTR has not demonstrated that reduced negotiation flexibility
would cause the requisite harm to national security.  (Id. at 20-
23.)  CIEL maintains that USTR's previous disclosure of three
related documents undermines the defendants' arguments for
withholding Document 1.  (Id. at 19-21.)  Finally, CIEL contends
that USTR's arguments regarding the harm from reduced flexibility
continue to be inconsistent with the argument that adhering to
the confidentiality agreement is necessary to maintain the trust
of foreign negotiating partners.  (Id. at 23-25.)

<u>DISCUSSION</u>

In a FOIA suit, the agency resisting disclosure bears the
burden of persuasion in defending its action.  5 U.S.C.
§ 552(a)(4)(B); <u>see also</u> <u>Akin, Gump, Strauss, Hauer & Feld, LLP
v. U.S. Dep't of Justice</u>, 503 F. Supp. 2d 373, 378 (D.D.C. 2007).
An agency is entitled to summary judgment if it demonstrates that
no material facts are in dispute and that the requested material
is exempt from disclosure.  <u>Students Against Genocide v. Dep't of
State</u>, 257 F.3d 828, 833 (D.C. Cir. 2001).  In order to provide
an effective opportunity for the requesting party to challenge
the applicability of an exemption and for the court to assess the
exemption's validity, "[t]he description and explanation the
agency offers should reveal as much detail as possible as to the
nature of the document, without actually disclosing information

- 8 -

that deserves protection." <u>Oglesby v. U.S. Dep't of Army</u>, 79 F.3d 1172, 1176 (D.C. Cir. 1996).  Where an agency fails to meet its burden to justify application of a FOIA exemption, a court may order disclosure.  <u>Coastal States Gas Corp. v. Dep't of Energy</u>, 617 F.2d 854, 870 (D.C. Cir. 1980).

USTR relies on FOIA Exemption 1 to oppose CIEL's request. Exemption 1 protects from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]"  5 U.S.C. § 552(b)(1).  For an agency to justify withholding material under Exemption 1, it must by affidavit:

> (1) identify the document, by type and location in the body of documents requested; (2) note that Exemption 1 is claimed; (3) describe the document withheld or any redacted portion thereof, disclosing as much information as possible without thwarting the exemption's purpose; (4) explain how this material falls within one or more of the categories of classified information authorized by the governing executive order; and (5) explain how disclosure of the material in question would cause the requisite degree of harm to the national security.

<u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 224 (D.C. Cir. 1987).  Courts should accord agency affidavits expressing national security concerns substantial weight and take account of the fact that harm to national security cannot be predicted with precision but rather will always be somewhat speculative in nature.  <u>Wolf v. CIA</u>, 473 F.3d 370, 374 (D.C. Cir. 2007).

- 9 -

Nonetheless, affidavits that contain categorical or conclusory statements, or which are contradicted by other evidence in the record, will not pass muster.  PHE, Inc. v. Dep't of Justice, 983 F.2d 248, 250 (D.C. Cir. 1993); Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  ACLU v. U.S. Dep't of Def., 628 F.3d 612, 619 (D.C. Cir. 2011) (quoting Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal quotations omitted)).

    The Executive Order under which USTR classified Document 1 articulates the "degree of harm" required by providing that the "Confidential" designation shall be applied where unauthorized disclosure of the classified information "reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe."  E.O. 12958 1.2(a)(3) (as amended by E.O. 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003)).  "'Damage to the national security' means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information."  Id. § 6.1(j).  USTR asserts that the document is properly classified because "USTR determined that the unilateral release of Document 1 'reasonably could be expected to

- 10 -

cause damage' to the United States' foreign relations." (Defs.'
Mem. at 1 (quoting Executive Order 12958 § 1.2(a)(3)). However,
USTR's various arguments do not present a logical or plausible
explanation for its determination, and the record does not
support a reasonable anticipation of harm from disclosure.

The April 12, 2011 opinion noted that while the prospect of
revealing foreign government information typically supports
withholding disclosure under Exemption 1, the claim that a breach
of the FTAA confidentiality agreement would harm national
security is less compelling here since the United States would be
revealing its own position only.  USTR maintains that because the
confidentiality agreement covered *all* of the material exchanged
during negotiations, the loss of trust is the same.  There is,
however, a meaningful difference between the United States'
disclosure of information that it receives in confidence from a
foreign government, with the foreign government's understanding
that the information will be kept secret, and the United States'
disclosure of a document that it itself created and provided to
others.  While a breach of the confidentiality agreement will
occur in either case, the resulting affect on the United States'
foreign relations -- the key factor for assessing whether the
document is properly classified -- is not identical.  In <u>Brayton
v. Office of U.S. Trade Representative</u>, 657 F. Supp. 2d 138
(D.D.C. 2009), the court's determination that USTR was legally

- 11 -

entitled to withhold a document covered by a confidentiality
agreement did not hinge on the mere existence of the agreement,
but depended on the circumstances of the specific disclosure in
that case.  In particular, the court took account of the fact
that the negotiations to which the requested document related
were ongoing and disclosure would have revealed the current and
sensitive negotiating positions of both the United States and the
European Union.  Id. at 145; see also Ctr. for Int'l Envtl. Law
v. U.S. Trade Representative, 237 F. Supp. 2d 17, 32 (D.D.C.
2002) (finding that defendants had properly invoked Exemption 1
where the defendants' declarant articulated the particularly
sensitive and controversial topic of the requested documents, the
disclosure of which would reveal high-level internal government
deliberations and interagency disagreements).

By contrast, USTR's arguments regarding loss of trust are at
a high level of generality, asserting that the confidentiality
agreement facilitates the "give-and-take of negotiations" (Second
Bliss Decl. ¶ 5) without articulating particular reasons why its
foreign negotiating partners would have any continued interest in
maintaining the secrecy of the United States' own initial
position on the phrase "in like circumstances."  The harm
resulting from breach of the confidentiality agreement here, and
the asserted need to insulate negotiations from potential
opposition from participating nations' "vested local economic

- 12 -

interests" in order to provide "room to negotiate" and make it less likely that foreign partners will "adopt and maintain rigid negotiating positions unfavorable to U.S. economic and security interests" (First Bliss Decl. ¶ 10), is substantially mitigated because the FTAA negotiations are not ongoing.  The defendants' failure to assert any particular present sensitivities implicated by Document 1 leaves the breach of the confidentiality agreement as the sole basis for inferring a loss of trust.  A per se rule that existence of a confidentiality agreement provides an adequate basis for proper classification of a covered document is flatly incompatible with FOIA's commitment to subject government activity to the "the critical lens of public scrutiny." <u>Alliance for the Wild Rockies v. Dep't of the Interior</u>, 53 F. Supp. 2d 32, 35 (D.D.C. 1999).  Although a court need not "agree in full with the defendants' evaluation of the danger," USTR's judgment must pass the "test of reasonableness, good faith, specificity and plausibility." <u>Am.-Arab Anti-Discrimination Comm. v. DHS</u>, 516 F. Supp. 2d 83, 89 (D.D.C. 2007) (internal quotations omitted). USTR's arguments that a loss of trust amounting to damage to foreign relations would occur upon disclosure here do not pass this test.

     The standing agreement is that the nations will "not release to the public any negotiating documents that they exchanged in the course of the negotiations, other than on the specific

- 13 -

request of a participating government and in the absence of any
objection from another such government." (Second Bliss Decl.
¶ 4.) The agreement therefore permits the United States to
request disclosure of a document and to disclose it if it
receives no objection. With regard to Document 1, the record
lacks any indication that the United States' FTAA partners would
oppose disclosure. To be sure, the prior proceedings in this
litigation have not imposed on the USTR any obligation to request
disclosure, and, as is discussed above, USTR's argument is that
*unilateral* disclosure compelled by this action would itself
constitute harm to foreign relations. However, because breach of
a confidentiality agreement does not suffice to establish harm
where the breach is caused by release of the United States' own
information, reasons for predicting a loss of foreign
governments' trust must be tied, but are not tied here, to the
specific content of the document at issue. Moreover, the FTAA
nations' agreement that all documents will be "derestricted and
available for public release on December 31, 2013, *unless a
country were to object to the release of one of its own documents
at that time*" (Third Bliss Decl. ¶ 5) supports CIEL's argument
that the primary interest protected by confidentiality is a
country's ability to determine the release of its own materials,
not to keep others from releasing theirs. (Pl.'s Reply at 7.)

- 14 -

Aside from the arguments premised on breach of the confidentiality agreement, USTR's additional arguments for withholding Document 1 do not present logical or plausible reasons why disclosure would cause harm to United States' foreign relations.  First, although USTR's renewed motion attempts to resolve the apparent inconsistency, identified in the April 12, 2011 opinion, between USTR's expressed desire both to maintain the trust of foreign governments by adhering to the confidentiality agreement and to maintain its own flexibility to assert a different interpretation of "in like circumstances" in different contexts, its resolution of that issue undercuts its argument that reduced flexibility will harm foreign relations. Specifically, USTR's declarant clarifies that, since the FTAA has not been concluded and the position expressed in Document 1 is not considered binding by the FTAA nations, those governments would not view it as a breach of trust if the United States advanced a different interpretation of "in like circumstances" in arbitral proceedings or in future negotiations.  (Defs.' Mem. at 15-16 (citing Second Bliss Decl. ¶¶ 9-10).)  The declarant emphasized, based on her "experience as a trade negotiator," that "[t]rade negotiating partners will commonly remind each other that 'nothing is agreed until everything is agreed,' which means that a party is free to revise its positions at any point until a final agreement is reached."  (Second Bliss Decl. ¶ 11.)

- 15 -

Accepting USTR's logic on this point, and assuming that the
FTAA nations will not find the United States' shifting positions
on the term untrustworthy, the grounds for predicting that
disclosure of Document 1 would reduce significantly the United
States' flexibility in the future are tenuous.  If, as defendants
maintain, trade negotiators understand that an initial position
like Document 1 is a non-binding starting point, and that,
accordingly, the United States may revise or withdraw it at any
time, it is unclear why disclosure of the document "reasonably
could be expected to cause damage" to the United States' foreign
relations by reducing future flexibility.  (Defs.' Mem. at 1.)
FTAA negotiations extended over the 1990s and 2000s, across
multiple United States administrations.  (Defs.' Stmt. ¶ 2.)
Defendants have presented no "logical or plausible" reason, <u>ACLU</u>,
628 F.3d at 619 (internal quotations omitted), why future
negotiating partners would have so firm an expectation that the
current or future United States administration would or should
adhere to the same interpretation of "in like circumstances"
presented in the FTAA context such that the United States will be
impeded in presenting a different interpretation.

For the same reason, USTR's argument that withholding
Document 1 is necessary to preserve its negotiating capital is
unpersuasive.  According to the declarant, "[e]ven if the Untied
States was prepared to embrace in a future agreement an

- 16 -

interpretation of 'in like circumstances' identical to that
reflected in Document 1, U.S. negotiators might not want that
interpretation to be included in the opening U.S. position," but
rather they "might want to start with a different offer, and then
'negotiate up' to the positions taken in Document 1" or they
might want to accept a substantially similar proposal from a
trading partner.  (Second Bliss Decl. ¶ 10.)  Neither of these
options, however, would be foreclosed by the disclosure of
Document 1.  Because the interpretive position explained in that
document is not binding and, according to USTR's declarant, "the
United States does not risk eroding the trust of its negotiating
partners simply by altering the positions it advances during
trade negotiations" (Second Bliss Decl. ¶ 11), the United States'
ability not to open with Document 1's interpretation in the
future, or to accept it from a negotiating partner, is not
realistically imperilled by disclosure.  Similarly, USTR's
argument that disclosure of Document 1 could increase the United
States' exposure to adverse arbitration decisions is
insufficiently substantiated.  The FTAA was never concluded and
arbitrators, like trade negotiators, are generally aware of the
non-binding, preliminary nature of the interpretive position
articulated in Document 1.  The case law on which USTR relies for
this proposition concerned instances where material relating to
*concluded*, albeit possibly unenforceable, treaties were consulted

for interpretative assistance.  (Defs.' Opp'n at 9.)  Document 1,
as the declarant herself emphasizes (Second Bliss Decl. ¶ 7), was
expressly a *preliminary* position, and the risk that international
arbitrators will adopt the position, much less rely on it to the
United States' detriment in arbitration, is too speculative to
justify a reasonable expectation of harm to foreign relations.[2]

## CONCLUSION

The present round of briefing afforded USTR a third
opportunity to meet its burden to justify application of
Exemption 1.  USTR, however, fails to provide a plausible or
logical explanation of why disclosure of Document 1 reasonably
could be expected to damage United States' foreign relations.
USTR's motion for summary judgment therefore will be denied,
CIEL's cross-motion will be granted, and USTR will be enjoined
from withholding Document 1.  An appropriate order accompanies
this memorandum opinion.

---

[2] CIEL argues that USTR's release of other, related
documents in the course of this litigation undermines USTR's
argument for withholding Document 1.  (Pl.'s Reply at 2.)  The
D.C. Circuit has "repeatedly rejected the argument that the
government's decision to disclose some information prevents the
government from withholding other information about the same
subject."  ACLU, 628 F.3d at 625.  The present opinion bases the
decision to grant summary judgment to the plaintiff on the
defendants' failure to articulate logical or plausible reasons to
withhold Document 1, and does not rely on the defendants'
previous disclosure of Documents 8, 38, and 43.

- 18 -

SIGNED this 29th day of February, 2012.


                                    _____/s/_____
                                    RICHARD W. ROBERTS
                                    United States District Judge